## J. D. STEELE *v.* W. M. CALHOUN.

1. CONTESTED ELECTIONS. *Change of place for voting.*

The *house* in which the voting for a country precinct had taken place for some years was moved several months before an election three-quarters of a mile from its former site, its name being unchanged. *Held,* that an election held in the house at its new site was not on that account invalid.

2. SAME. *Voting place. No formal designation.*

The fact that the voters of a precinct have by general consent selected a certain place for holding the elections of the precinct and have been in the habit of voting there will make the election held there legal, there having been no formal designation of a voting place by competent authority.

3. SAME. *Marked ballots.*

By the rule established by § 137 of the Code of 1880, "any device or mark, etc.," is prohibited and sufficient to condemn the ballot on which it is found.

APPEAL from the Circuit Court of Tallahatchie County.

HON. A. T. ROANE, Judge.

At the general election for county officers in Tallahatchie County in November, 1883, J. D. Steele and W. M. Calhoun were rival candidates for the office of sheriff, Steele being the nominee of what was known as the "Independent party," and Calhoun the

nominee of the Democratic party. Steele received eight hundred and eighty-six votes and Calhoun received six hundred and ninety-one. It appears that some of the tickets cast for each candidate were so marked as to distinguish them from the other tickets cast at the election. The distinguishing mark consisted of a *dotted line* across the face of the ticket thus :

## Independent Ticket.

For District Attorney,
**W. H. FITZGERALD.**

For Senator,
**J. N. McLEOD.**

For Representative,
**W. B. MARSHALL.**

For Sheriff,
**J. D. STEELE.**

For Chancery Clerk,
**W. M. BURDESHAW.**

For Circuit Clerk,
**W. H. PORTER.**

For Treasurer,
**A. B. C. DUKE.**

For Assessor,
**R. D. MURPHREE.**

For Surveyor,
**A. B. WORTHAM.**

For Supervisor,
**FRANCIS ANKRUM.**

For Magistrate,

..................................................................................

For Constable,
**W. H. PORCH.**

Of the tickets thus marked Steele received two hundred and thirty-five and Calhoun seventeen. These tickets were all rejected by the commissioners of election, and only the unmarked tickets counted, which made the vote stand : Steele, six hundred and sixty-one ; Calhoun, six hundred and seventy-four. And Calhoun was declared elected.

It appears further that for many years prior to the election in 1883, the voting place in one of the precincts in the county was at a building called Dogwood Flat Church. This voting place does not appear to have been established by any legally constituted authority, but was agreed upon as the voting place for the precinct by the general consent of those in the habit of voting there. A few months before the election in 1883 the building above referred to was removed from its old site to a point three-quarters of a mile away, but was still known as Dogwood Flat Church, and was used, as formerly, for public assemblies and for holding justices' courts, etc. The election for 1883 was held at Dogwood Flat Church at its new site, and it does not appear from the record that any of the electors of the precinct were prevented from voting or otherwise prejudiced by the removal.

Steele contests the election with Calhoun, claiming that the action of the commissioners in rejecting the marked votes was unlawful, and that the votes should have been counted, and that the box from the Dogwood Flat precinct should not have been counted, because the election was not held at the place known for years as Dogwood Flat voting place. Judgment was rendered against him in the court below, from which he appeals.

*W. H. Fitz-Gerald*, for the appellant.

1. The second assignment of error is that the court refused to exclude from the count the ballots cast in the Dogwood Flat district, because the election for that district was held at a place other than the place fixed by law. As to election districts, the Code of 1880, § 102, says ; " The election districts heretofore established by the county board of registration in each county shall continue to be the election districts, unless altered by the commissioners of elections of the county, whose duty it shall be to establish such

districts and alter and change the same from time to time as may be proper. Section 103 makes it the duty of the board of supervisors to cause an entry to be made on the minutes of the board, etc., etc., defining by metes and bounds the several districts, and suitably designating each of them and establishing one voting place in each district, which election districts and voting places shall be those heretofore designated by the county board of registration. " Those provisions of law which fix the time or place of holding elections are to be construed as mandatory, and not as merely directory. The reason for this is obvious. Every voter is presumed to know the law and to be thereby informed as to the time when and the place where he may deposit his ballot," etc. McCrary on Elections, Second Ed., § 114, and authorities cited. In § 115 of same book is quoted the language of Thompson, C. J., in *Chadwick* v. *Melvin,* a Pennsylvania case reported in Brightly's Election Cases 251.

2. The third assignment of error is in excluding from the count and the consideration of the jury the several tickets on which appeared dotted lines, etc. There is a manifest difference between these tickets and the *fac simile* in the case of *Oglesby* v. *Sigman,* 58 Miss. 502. The "*fac simile* ticket" has on its face four devices or marks of different kinds, and all of an ornamental character, not at all necessary or even of practical utility. The tickets in this case have upon their face, and which caused their rejection by the commissioners of election, a dotted line, which, it is true, was not necessary, but which was of practical utility, and of more utility than the commas and periods on the tickets. The line was to indicate where the name of the candidate for magistrate should be written, so as to prevent getting within the minimum distance prescribed by law, between the names of candidates—to prevent having the tickets vitiated. The line is what printers call " a leader," which is a contrivance, and not a device. The "leader" is not, in contemplation of the statute, " a mark" any more than are commas and periods marks in the sense of the statute ; and certainly it will not be contended seriously that the law intended to exclude from the face of the ticket the ordinary punctuation marks. In order to

ascertain the intention of the statute the evil sought to be remedied must be first known. "The general rule," as observed by Byles, J., "for the construction of acts of Parliament is that the words are to be read in their popular, natural, and ordinary sense, giving them a meaning to their full extent and capacity, unless there is reason upon their face to believe that they were not intended to bear that construction because of some inconvenience which could not have been absent from the mind of the framers of the act which must arise from the giving them such large sense." "And again, 'In construing an act of Parliament, when the intention of the legislature is not clear we must adhere to the natural import of the words; but when it is clear what the legislature intended we are bound to give effect to it notwithstanding some apparent deficiency in the language used.'" Broom's Legal Maxims, 7th Ed., 570. Our own court say in many cases that in construing a statute the object is to get at its spirit and meaning, its design and scope, etc. *Dixon* v. *Doe*, 1 S. & M. 70. That a statute will be construed according to its object and spirit, though against the letter. *Painter* v. *Trotter*, 10 S. & M. 537 ; *Love* v. *Taylor*, 26 Miss. 567 ; *N. O. J. & G. N. R. R. Co.* v. *Hemphill*, 35 Miss. 17 ; *Learned* v. *Corley*, 43 Miss. 687 ; *Leachman* v. *Musgrove*, 45 Miss. 540; *M. C. R. R. Co.* v. *State*, 46 Miss. 157; *Mitchell* v. *Wood*, 47 Miss. 235; *Witherspoon* v. *Blewitt*, 47 Miss. 570.

*W. S. Eskridge*, for the appellee.

1. The mark on the rejected ticket was formed by a line running entirely across the face of the ticket, made of small dots of black printer's ink, near the bottom. Under our statute, § 137, Code 1880, did this line constitute such a device or mark on those tickets or ballots as made them known or distinguishable from others, if so, then they were clearly illegal and the commissioners of election did right in not counting them. The language of the statute is, "without any device or mark by which one ticket may be known or distinguished from another." This language is broad and plain, and without the least ambiguity expresses the legislative will. The object and purpose of the law is to preserve the absolute security of the ballot by requiring all tickets to be exactly alike and uniform

in their make-up.   Then if there be on any ticket any device or mark (no matter how small or how made) by which it may be known or distinguished from another it is illegal and must not be counted.   Then in the case at bar we find on the face of the rejected tickets a black dotted line running entirely across them.   This mark was not on the tickets that were counted by the commissioners of election, as is shown by the testimony.   The very question here involved has been definitely settled in the case of *Oglesby* v. *Sigman*, 58 Miss. 502, by this court.   No mark on the ticket in that case is more prominent or distinct than the mark on this ticket; it is true there are more of them, but the question is not as to the number of marks or devices, but is there " any mark or device by which one ticket may be known or distinguished from another?" Certainly the better and sounder reasoning is to be found in *Oglesby* v. *Sigman*, where it is held by this court that the intent for which the distinguishing mark is used makes no difference. This construction preserves the statute as it is made, and allows of no exceptions to be engrafted on it.   This view is also sustained by the Supreme Court of Pennsylvania in the case of *Commonwealth* v. *Wollper*, 3 S. & R. 29, when it was holden that an eagle printed on the head of the ticket as a distinguishing mark rendered it void.   The case of *Kirks* v. *Rhoades*, 46 Cal. 398, is somewhat in conflict with the current of authorities on this point, but it will be seen that the reasoning of the court is not very sound or satisfactory.   The decision of this court in *Oglesby* v. *Sigman* is adhered to in its construction of § 137, Code 1880, in *Perkins* v. *Carraway*, 59 Miss. 222.

2. All the proof in the case shows that the electors, knowing of the removal of the church, and that that building on its new site was the only one at which the election could be held in that precinct, of their own accord freely and voluntarily assembled there and held the election, which in all respects was quiet, legal, and orderly.   If such an election under the circumstances was not legal it would be hard to define what would constitute one.   But counsel for appellant argue that the law fixing the time and place is mandatory.   Let me briefly refer to some of the decisions on this point

36

in my reach. But first I will refer on this point to McCrary on
Elections, § 114, p. 128, Second Edition. The author says: "The
provisions of law which fix the time or place of holding elections
are to be construed as mandatory and not as merely directory. The
reason for this is obvious. Every voter is presumed to know the
law, and to be thereby informed as to the time and the place where
he may deposit his ballot; but if the time or place be changed
without proper authority and due notice no voter can be held as
legally bound to take notice of the change, and it can never be
known how many voters have been deceived thereby unless, in-
deed, all the persons entitled to vote should actually attend and
vote at the illegal place, which might, perhaps, be held as a waiver
of all objection thereto, provided the place was within the voting
precinct. As to the time of the election, of course the day cannot
be changed even by consent of all the voters." Here, then, in the
same paragraph in which this author says the law fixing the time
and place of holding an election is mandatory and not directory,
he says if all the voters in a precinct meet and vote at the illegal
place in the precinct it would amount to a waiver of all objection
thereto. This principle gives us more than we ask for in the Dog-
wood Flat precinct.

*Bailey & Bailey,* on the same side.

Counsel for appellant utterly fails to show that their client, the
appellant, was damaged by the holding of the election in this house.
They are unable to produce a single voter who would testify that
he failed to vote on account of the change of place of voting:
upon the contrary, it is clearly established by the proof that there
was a *full vote* as well as a *fair count.* It is not intimated any-
where that there was any fraud whatever in connection with this
change or the holding of the election at this box. How different,
then, is this case from the Pennsylvania case referred to above.
Then this change in place of holding this election, such a change
as it was, could only be termed an irregularity, if that, which did
not effect the election in the slightest. Then the popular will as
expressed at this box cannot be disregarded for such slight reasons.
*Pradat* v. *Ramsey,* 47 Miss. 24; *Barnes* v. *Board of Supervisors,*
51 Miss. 305.

CAMPBELL, C. J., delivered the opinion of the court.

The Dogwood Flat Church was the voting place for the election precinct in which it was situated, and had been for years without any formal designation by competent authority, but by the action of those participating in the several elections held there. Several months before the election of 1883 the house was removed to a point three-quarters of a mile from its former site and erected there by general consent of the neighborhood, and it was still called by its former name and was used as it had been before, for public assemblies and holding justices' courts. The election of November, 1883, was held in Dogwood Flat Church at its new site, and it does not appear that any elector was at any loss to ascertain where the election for that election district was being held or was prevented from voting because of a change of the place at which the polls were opened.

The election was properly held at Dogwood Flat Church.

The marked ballots were properly rejected. The rule established by § 137 of the Code of 1880 excludes "any device or mark by which one ticket may be known or distinguished from another," and we are not permitted to distinguish between the different devices or marks which may be put on ballots. "Any device or mark, etc.," is prohibited and sufficient to condemn the ballot on which it is found.

*Affirmed.*